FILED

2017 Nov-21  PM 06:23
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **TERRY BLUMENFELD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No.:** |
| | )   **4:16-cv-01652-VEH** |
| **REGIONS BANK, a Corporation,** | ) |
| | ) |
| **Defendant.** | ) |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Respectfully Submitted,

<u>/s/ M. Stan Herring</u>
**John G. Watts (ASB-5819-t82j)**
**M. Stan Herring (ASB-1074-n72m)**
Watts & Herring, LLC
301 19th Street North
Birmingham, Alabama 35203
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattsherring.com
stan@wattsherring.com
**Attorneys for Plaintiff**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................................i

TABLE OF AUTHORITIES ................................................................ ii

I.  **INTRODUCTION – REGIONS PULLED BLUMENFELD'S CREDIT REPORT ILLEGALLY AND SHARED THAT REPORT ILLEGALLY WITH BLUMENFELD'S MOTHER** ...............................................1

II. **STATEMENT OF FACTS** ..........................................................7

    A.  **Response to Movant's Statement of Claimed Undisputed Facts** ...................................................7

    B.  **Additional Undisputed Facts** ......................................13

III. **LEGAL ARGUMENT** ..............................................................20

    A.  **Background On FCRA Related To Credit Reports** .......20

    B.  **Overview Of Rules On Accessing Or Pulling A Credit Report** ......................................................................20

    C.  **In This Case The Only Possible Permissible Purpose Is Extension Of Credit But Regions Fails To Satisfy This Test** ...................................................................21

    D.  **After The Report Was Pulled, The Use Of The Report Violates FCRA** ..........................................................25

    E.  **Willfulness** ...................................................................26

    F.  **Invasion Of Privacy Is Not Preempted And Is A Jury Issue** ..............................................................................27

    G.  **Wantonness Goes To The Jury As There Was No Banker/Customer Relationship Between Defendant and Blumenfeld** ...........................................................29

IV. **CONCLUSION** ..........................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Alston v. Cen. Credit Servs., Inc.*,
2013 US Dist. LEXIS 120658 at \*6-8 (D. Md. 2013) .........................................24

*Beckstom v. Direct Merchant's Credit Card Bank*,
2005 US Dist. LEXIS 16071 at \*10-12 (D. Minn. 2005) ...................................24

*Bickley v Dish Network, LLC*,
751 F.3d 724 (6th Cir. 2014) ............................................................4, 21

*Crippen v. Charter Southland Hospital, Inc.*,
534 So. 2d 286, 288 (Ala. 1988) ..........................................................29

*Hammonds v. Aetna Casualty & Surety Co.*,
243 F.Supp. 793 (N.D.Ohio, 1965) ........................................................28

*Horne v. Patton*,
287 So. 2d 824 (Ala. 1973) .................................................................28

*Hudson v. Babilonia*,
192 F.Supp. 3d 274, 298-99 (D. Conn. 2016)........................................24

*Kruckow v. Merchs. Bank*,
2017 US Dist. LEXIS 113349 at \*13-14 (D. Minn. 2017) .......................... 23, 27

*McAnly v. Middleton & Reutlinger, P.S.C.*,
77 F. Supp. 2d 810, 814- 15 (W.D. Ky. 1999).......................................27

*Morris v. Northland Group, Inc.*
2016 US Dist. LEXIS 82215 at \*3-6 (W.D.MOS 2016)......................................24

*Rand v. Citibank, N.A.*,
2015 US Dist. LEXIS 14695 at \*7-8 (N.D.Ca. 2015)..........................................22

*Shepherd-Salgado v. Tyndall Fed. Credit Union*,
2011 US Dist. LEXIS 129128 (S.D.Ala. 2011) .....................................23

*Short v. Allstate Credit Bureau*,
  370 F.Supp. 2d 1173 (M.D. Ala. 2005)................................................................24

**Statutes**

15 U.S.C. §1681b(a)(3)(A) ................................................... 20, 21, 22, 26

15 U.S.C. §1681b(a)(3)(F).................................................. 21, 22

15 U.S.C. §1681h(e) ...........................................................27

## I.   INTRODUCTION – REGIONS <u>PULLED</u> BLUMENFELD'S CREDIT REPORT ILLEGALLY AND <u>SHARED</u> THAT REPORT ILLEGALLY WITH BLUMENFELD'S MOTHER

This is a simple case of a large bank wrongfully pulling Blumenfeld's personal and private credit reports.  This is in violation of the Fair Credit Reporting Act (FCRA) and Alabama law and therefore Summary Judgment is due to be denied, with the exception of the withdrawn Count III (Negligent Supervision).

Here, Regions Bank (Defendant) decided that it could make a mortgage loan to Blumenfeld to pay off an old loan with Blumenfeld's mother.

Defendant spills much ink talking about the supposed *advantages* of this for Blumenfeld.  This is irrelevant and not accurate as Blumenfeld owes nothing on this house, as the loan is in her mother's name only.  If Blumenfeld "refinanced" this house, she would legally owe the debt, although perhaps the payments could be reduced.  But none of this matters because the credit pull was illegal.

Because Blumenfeld, <u>never told Defendant that she wanted a loan</u>.  Never requested a loan.  Never authorized the pulling of her credit report.

Defendant, though, wanted to try to convince Blumenfeld to take out a mortgage loan.  So it pulled her report anyway.

Defendant must show this Honorable Court, as a matter of law and with no factual disputes, that Blumenfeld agreed with Defendant to seek out a mortgage loan.  That is, did Defendant have a permissible purpose in pulling the report?

Defendant fails for the simple reason that <u>Blumenfeld did not initiate the transaction</u> in question – she did not seek out a mortgage loan.

Defendant did discuss a mortgage loan for Blumenfeld with her mother but not with Blumenfeld.

Defendant and every single soul in the world could discuss a mortgage loan and think it is a wonderful idea, but if Blumenfeld did not agree, Defendant has no right to pull Blumenfeld's credit report.  (Just as Defendant has no right to pull this Honorable Court's credit report or the credit reports of the undersigned just because it thinks it can "get us a better deal" on our mortgage).

There is a lot of discussion about Blumenfeld and her mother being "joint owners" or "joint borrowers."  They were joint owners of the subject property but not joint borrowers.

Does being joint owners (or even joint borrowers) mean the mother is the agent for Blumenfeld?  No.  The test would be whether Blumenfeld indicated, through word or deed, that her mother was her agent.

She did not.

And while not the legal test, did Blumenfeld's mother tell Defendant that she was the agent for Blumenfeld?  No.  And she was not, in fact, Blumenfeld's agent.

So *why* did Defendant pull Blumenfeld's report?

It wanted to market to her to sell her a loan.  This is how Regions makes money – finding and closing mortgage loans.

But what about the phone call between Blumenfeld and her mother? Did this call give permission to Defendant to pull Blumenfeld's consumer report?

No, for two reasons.

First, Blumenfeld's mother never communicated, in word or deed, that Blumenfeld gave permission for Defendant to pull Blumenfeld's consumer report. Silence is not permission.

Second, Defendant pulled Blumenfeld's report **before** Blumenfeld's mother even asked Blumenfeld about permission to pull the report.

And *why* did Defendant insist on having her mother call Blumenfeld? Because it knew it needed permission in the form of Blumenfeld saying she wanted a mortgage loan and/or wanted her reports pulled.

So Defendant needed permission from whom?  Not Blumenfeld's mother. Or a stranger.  Or a second cousin three times removed.

But from Blumenfeld, the actual consumer.

So Defendant had Blumenfeld's mother call Blumenfeld to see if she wanted a mortgage loan.

But Defendant pulled the report on Blumenfeld **before the call was finished**.  And Defendant never asked to speak to Blumenfeld.  Why not?

Because it was trying to justify what it had already done.  The report on Blumenfeld had already been pulled before the call.  This was "*after the fact underwriting*" by Defendant.  The call was simply to provide "cover" to Defendant for what it had already done:  pulled her reports.

The bottom line is Defendant had no permission to pull Blumenfeld's credit reports.

The Defendant's brief referencing identity theft cases is like a movie façade: impressive at first until you take a look behind the façade.

What is an identify thief?  Someone who impersonates **you**.

As an example, Dish Network (the prime case[1] relied upon by Defendant) thought the consumer in that case was applying for service.  And so it pulled a report on the consumer.  It turns out it was an identity thief.  The Court ruled no FCRA violation which makes sense and is reasonable as long as there is no reason to doubt it was the consumer requesting service.

Did Defendant think Blumenfeld herself was requesting a mortgage loan? No.

Did Defendant think Blumenfeld's mother was actually Blumenfeld?  No.

Did Blumenfeld's mother impersonate Blumenfeld?  No.

---

[1] *Bickley v. Dish Network, LLC* 751 F.3d 724 (6th Cir. 2014).

Defendant knew the person in front of it — Blumenfeld's mother — was not Blumenfeld.

So for Defendant to wrap itself in the "protection" of "we got tricked by an ID theft criminal" is meaningless.

And then, to double down and make matters worse, <u>Defendant gave Blumenfeld's credit report to her mother</u>.

And not in a sealed envelope with "*For Blumenfeld's eyes only*" marked on it but just handed it to the mother <u>after</u> it went over the report in detail with her, focusing on the negative and embarrassing parts that would prevent Blumenfeld from obtaining the mortgage loan she never requested.

Defendant explained how Blumenfeld should fix these defects — these flaws — so Defendant could make her a loan.

But Defendant argues that it did nothing wrong — it was just trying to help Blumenfeld — it assumed Blumenfeld wanted the help — and it is no big deal as this disclosure was to Blumenfeld's mother.

Let's change the context for illustration purposes.  Instead of a consumer report, it is a <u>medical report</u>.  (Defendant admits that consumer's private financial information should be treated the same as private medical information so this is a fair illustration).

Would the Defendant — if a doctor — have the right to pull Blumenfeld's medical records?  Answer:  Only if treating Blumenfeld.

Could Defendant pull the medical reports and records before Blumenfeld gave permission to treat her?  Absolutely not.

Could Defendant give Blumenfeld's medical records — whether positive or negative — to Blumenfeld's mother?  After all, Defendant would argue, they lived together at one time and what's the big deal about your mother knowing your personal private medical information?

The big deal is your mother is not you and **she has no right to know your personal private medical information**.

If Blumenfeld was not there with the doctor, her mother could call Blumenfeld to ask if she wanted the doctor to treat Blumenfeld.  If this happened, would not the doctor ask to speak to Blumenfeld — even a credit card company does this when a spouse wants to talk to customer service — and not rely on an unheard private conversation between mother and Blumenfeld?

And if the doctor for some unknown reason wanted to rely on that conversation, would the doctor not ask, "So, did your daughter give me permission to pull her medical reports and does she want to be my patient" before pulling the medical reports?

Here the Defendant pulled the reports **before** the call was over.  And never asked Blumenfeld's mother if Blumenfeld agreed.   Blumenfeld's mother never indicated in any way or manner that told Defendant that Blumenfeld agreed to her private personal reports being pulled by Defendant.

And no one told Defendant that Blumenfeld agreed to those personal, private, reports being disclosed and discussed with Blumenfeld's mother.

And the attitude of the Defendant throughout this litigation — and in the brief — is one of a lack of repentance and instead it is one of defiance that it certainly had the right to do everything it did and there is nothing Blumenfeld can or should do about it.

Blumenfeld asks this Honorable Court to reject this and let a jury decide if the conduct of Defendant was appropriate or inappropriate under the FCRA and Alabama law.

## II.    STATEMENT OF FACTS

### A.    Response to Movant's Statement of Claimed Undisputed Facts

*15.    "Also, in 2014 Ms. Fryer made the Plaintiff a co-owner on her checking and savings account at Regions."*

**Dispute:**     Blumenfeld disputes this fact as incomplete.  Ms. Fryer, her mother, had multiple accounts at Regions, not just a checking and savings account.  Also, in addition to the Plaintiff, Ms. Fryer added her son to the checking and savings

account, but retained sole ownership over several other accounts. (Ex. "B," Depo. of Fryer 46:22-47:12).   Additionally, Ms. Fryer's also made only her son a co-owner on a money market account.  (Ex. "B," Depo. of Fryer 47:14).

19.  *"After being introduced to Mr. Goodwin, Ms. Fryer sat down at his desk and he asked her some questions. (Id. at 64:1-7.)"*

**Dispute:**     Instead of asking Ms. Fryer "some questions" right after they were introduced, the first thing Goodwin did was to pull her credit report. Then, he began asking her questions. (Ex. "B," Depo. of Fryer p. 63:7-64:7).

19.  *"Then, Mr. Goodwin said they could see if the Plaintiff could refinance the mortgage and secure a lower interest rate. (Id. at 66:3-10.)."*

**Dispute:**     Goodwin did not ask Ms. Fryer about Blumenfeld taking on the mortgage until after he had pulled Ms. Fryer's credit report and discovered that she had two mortgages. (Ex. "B," Depo. of Fryer p. 63:17-65:20). Goodwin actually stated, "Well, we could see if Terry [Blumenfeld] could take this mortgage upon herself." (Ex. "B," Depo. of Fryer p. 66:6-8).

19.  *"That made sense to Ms. Fryer given that the Plaintiff was already making the payments on the mortgage. (Id. at 66:19-23.)"*

**Dispute:**     Ms. Fryer actually testified that she hadn't given it a lot of thought and that it made sense to her at the time of her deposition, not as a part of what was going on in May 2016. (Ex. "B," Depo. of Fryer p. 66:19-67:3).

20.     *"Next, Mr. Goodwin asked Ms. Fryer to call the Plaintiff to see if it was okay to pull and discuss her credit report. (Id. at 67:17-21, 76:18-23, 77:1). While sitting in Mr. Goodwin's office, Ms. Fryer called the Plaintiff and told her that she was at Regions trying to get a lower interest rate loan on the Hopwood Home and that Regions needed the Plaintiff's permission to pull her credit report. (Id. at 68:10-14).  The call was made to the Plaintiff so as to receive her consent. (Ex. "C," Id. at 90:13-14.)"*

**Dispute:**     The "next" event was not Goodwin asking Ms. Fryer to call Blumenfeld to see if it was ok to "pull and discuss her credit report." In fact, Goodwin actually began accessing plaintiff's credit report and started <u>printing it before he said anything about calling Blumenfeld</u> and before he knew whether Blumenfeld wanted a loan or that he had permission to pull her credit. Ms. Fryer specifically testified, "[h]e moved to – well, he typed – he was typing, and then pages were coming out of his printer. And he said, "I guess you should call Terry to see if it's okay to pull her credit report." (Ex. "B," Depo. of Fryer p. 67:18-21). Fryer further contradicted Regions account when she testified as to the phone conversation she had with Blumenfeld, testifying that she told Blumenfeld, "I'm at Regions with Mr. So and So trying to get a lower rate on the house. He needs your permission to pull the credit report on you… She said okay, but then she said ,

"No. I don't want him to do that." And I said, "Well, it's too late. He has it." (Ex.

"B," Depo. of Fryer p. 68:10-19).

Upon yet further questioning about the timing of Goodwin pulling

Blumenfeld's credit report, Ms. Fryer testified,

> Q.    Now you said it was too late, that he has it.
> A.    "It's too late. He has it."
> Q.    Had he already shown you the credit report at that time?
> A.    It was coming out of the printer.
> Q.    Had he looked at it at that point?
> A.    By the end of my conversation, you, it's pages. And he turned
>        back toward me and laid it in front of him.

(Ex. "B," Depo. of Fryer p. 69:18-70:16).  Additionally, Goodwin did not ask Ms.

Fryer to call and see if it was ok to <u>discuss</u> Blumenfeld's credit report, but instead

to see if he could pull it. (Ex. "B," Depo. of Fryer p. 67:18-21).

*22.    At that point in the conversation, the Plaintiff said "yes." Then, next she told*

*her mother that she did not want it pulled. (Id. at 98:15-19). At that point, her*

*mother told the Plaintiff that it was too late and her mother hung up. (Id. at 99:1-4,*

*101:20-22).*

**Dispute:**    After Blumenfeld said yes, she "immediately" said no she did not

want it pulled. (Ex. "A," Depo. of Blumenfeld p. 98:17-19).    Additionally,

Plaintiff's mother did not hang up right after saying it was too late. Defendant

omits a crucial fact consistently testified to by both Blumenfeld and her mother, as

to why it was "too late." Fryer told Plaintiff the report had already been pulled.

(Ex. "A," Depo. of Blumenfeld p. 99:2-4, 101:10-19; Ex. "B," Depo. of Fryer p. 68:16-19, 69:18-19, 22).

24.    "... *Indeed, Mr. Goodwin specifically believed that the Plaintiff had provided consent to pull her credit report to look at potential refinance options. (Ex. "C," p. 147:6-12.) So, Mr. Goodwin believed that once Ms. Fryer completed her call with the Plaintiff that he had full consent to pull the Plaintiff's credit report. (Id. at 30:15-23, 31:1-2.) Regions had received permission to pull the credit report. (Ex "D," pp. 20:19-24, 21:11-21.)"*

**Dispute:**    This is false and disputed, as Goodwin began pulling Blumenfeld's credit report <u>before</u> he knew whether Blumenfeld even wanted a loan and before he knew whether she had given him permission. (Ex. "A," Depo. of Blumenfeld p. 99:2-4, 101:10-19; Ex. "B," Depo. of Fryer p. 68:16-19, 69:18-19, 22). Additionally, Goodwin did not ask Fryer once she got off the phone what Blumenfeld had said, instead he immediately started reviewing and discussing Blumenfeld's now printed credit report with her mother. (Ex. "B," Depo. of Fryer p. 69:18-70:16).

25.    *"In this matter, there were many factors that indicated to Regions that the Plaintiff and her mother were joint borrowers relative to the Hopwood Home…"*

**Dispute:**    Terry Blumenfeld was <u>not a "joint borrower"</u> with her mother on the existing loan for the Hopwood home.  The only person who "borrowed" or owed

money on the home was Jo Ann Fryer. (Ex. "B," Depo. of Fryer p. 49:2-10). Additionally, Blumenfeld and her mother were not being considered as co-applicants on a new or refinanced loan. Only Blumenfeld was being considered to replace her mother on the loan. (Ex. "B," Depo. of Fryer p. 66:3-10).

26.     *"There was a business purpose for pulling the credit report, as Ms. Fryer indicated that she wanted to explore options for a new loan for the Hopwood Home, including a potential option where the Plaintiff took out the loan. (Ex. "A," Depo. of Blumenfeld Id. at 59:13-20.)"*

**Dispute:**     Both Ms. Fryer and Tracy Goodwin understood when she sat down with him that the purpose of her meeting was to seek a lower interest rate for <u>Ms. Fryer's loan</u>. That was what the Regions' employee, "Tiffany" had asked Ms. Fryer. (Ex. "B," Depo. of Fryer p. 61:18-22, 63:21-23)  Tiffany's introduction to Mr. Goodwin was the same. (Ex. "B," Depo. of Fryer p. 63:21-23)  Consequently, Goodwin then did have a "business purpose" to pull Ms. Fryer's credit report, but not Blumenfeld's, which is what he did at that point.  (Ex. "B," Depo. of Fryer p. 64:2-9)  After seeing the Hopwood loan on Ms. Fryer's credit report, Goodwin suggested to Ms. Fryer that they could see if Blumenfeld could take on that on that mortgage at possibly a lower interest rate. (Ex. "B," Depo. of Fryer p. 49:2-10).

27.     *"The objective and purpose of Mr. Goodwin's conversation with Ms. Fryer was to explore an opportunity to reduce the monthly payment amount by way of*

*refinancing the existing loan, as the Plaintiff was making the payments on the*

*Regions mortgage. (Ex. "C," Depo. of Goodwin  Id. at 154:10-23, 155:1.) Based*

*on his conversation with Ms. Fryer, Mr. Goodwin understood that the objective of*

*the meeting was to provide payment relief to the Plaintiff – to reduce the amount of*

*her monthly payment on the Regions loan. (Id. at 160:3-12.)"*

**Dispute:**  These statements are disputed for the reasons asserted above in response

to Movant's paragraph #26.

### B.   Additional Undisputed Facts

1.     Defendant's policies require that if two individuals, non-spouses, are jointly

applying for a loan, then the MLO has to have the consent of <u>both individuals</u> in

order to proceed with the loan and pull their credit reports. (Ex. "D" Depo of Smith

p.16:3-16).

2.     If one of the co-applicants is not present, then the mortgage officer should

talk with the absent applicant <u>directly</u> to be sure such absent applicant gives

consent to pull his or her credit. (Ex. "D" Depo of Smith p. 16:24-17:11). The

Regions employee is <u>not allowed</u> to rely on the representations of only one of the

applicants as to the consent of the other applicant. (Ex. "D" Depo of Smith p. 18:1-

7).

3.     Regions must have a business purpose **and** they must have consent before

they can run a credit report on a customer. (Ex. "D" Depo of Smith p. 28:5 – 12).

Once Goodwin determined that Ms. Fryer was the only name on the loan he needed permission or consent from the daughter in order to pull her credit. (Ex. "D" Depo of Smith p. 30:9 – 12). Under Defendant's policies Goodwin is not allowed to access the consumer's credit until he confirms that he has her consent. (Ex. "D" Depo of Smith p. 31:4-8).

4.     Defendant's representative admitted that if Goodwin pulled Blumenfeld's credit without her consent that would violate Regions' policies and procedures as well as the FCRA. (Ex. "D" Depo of Smith p. 42:11-18). Regions' representative admitted that allegedly trying to help a person whose credit was pulled <u>does not allow</u> an employee to discuss the person's credit with a third party. (Ex. "D" Depo of Smith p. 50:18-24). Goodwin never had permission or consent to disclose Blumenfeld's credit report with her mother. (Ex. "D" Depo of Smith p.52:8-13).

5.     The sole fact of two people having a joint checking account does not create a situation where one could ask for a loan or one could create a "business purpose" for a loan on behalf of the other party. (Ex. "D" Depo of Smith p. 64:19-65:4).

6.     From January 2015 to March 2016, plaintiff did not live at the Hopwood address, but instead lived in Georgia with her husband. (Ex. "A," Depo. of Blumenfeld pp. 25:4-23.)

7.     Ms. Fryer did not go to Regions to look into re-financing the Hopwood property loan at a lower rate. In fact, she was there because her debit card had been

compromised and someone from the bank had asked that she come into sign some paperwork to obtain a new card. (Ex. "B," Depo. of Fryer p. 61:2-22).

8.     Neither the Plaintiff nor Ms. Fryer initiated the idea of Blumenfeld taking out a mortgage, but instead the bank did, as noted from Ms. Fryer's statements to Blumenfeld during the phone call from Tracy Goodwin's office. (Ex. "A," Depo. of Blumenfeld pp. 97:21-98:5.)

9.     Blumenfeld did not want a loan because she did not believe she could qualify and did not want an inquiry on her credit report because she was aware that it would lower her score. (Ex. "A," Depo. of Blumenfeld pp. 98:17-99:15.)

10.     Blumenfeld's conversation with her mother while she was at Regions lasted a very short time, maybe one to two minutes. (Ex. "A," Depo. of Blumenfeld pp. 96:15-19.)

11.     Blumenfeld had no idea that the Regions employee would share her private information with her mother. (Ex. "A," Depo. of Blumenfeld pp. 102:6-103:9.)

12.     While Blumenfeld's mother was aware that Blumenfeld's credit was less than stellar, the mother was not aware of the details of the negative accounts and information before Defendant showed her Blumenfeld's report. (Ex. "A," Depo. of Blumenfeld pp. 60:5-60:12.)  While Plaintiff had shared some general information with her mother in the past and her mother knew about some of her financial struggles, she hadn't shared "to the extent of [her mother] seeing every bit of my

personal information in writing and reviewed with her." (Ex. "A," Depo. of Blumenfeld pp. 103:13-18)

13. At the time Goodwin shared Plaintiff's private credit information with her mother, plaintiff was living with her mother while some work was being done on her home. (Ex. "A," Depo. of Blumenfeld pp. 104:8-16).

14. When Blumenfeld got home from work she and her mom talked about what had happened. Plaintiff's mom again reiterated that Goodwin <u>began printing Terry's credit report and then said that Ms. Fryer should call Blumenfeld</u> to make sure it was ok. (Ex. "A," Depo. of Blumenfeld pp. 107:2-7). Ms. Fryer recalled again that as he was turning around <u>while she was on the phone he was stacking the pages of her credit report and then he reviewed it in detail with her</u>. (Ex. "A," Depo. of Blumenfeld pp. 107:9-19).

15. Finding out from her mother the level of detail Mr. Goodwin had gone into with her caused her to become very angry and "go off the handle" at the situation. (Ex. "A," Depo. of Blumenfeld pp. 108:4-8). At that point, Terry was not aware that Goodwin had given her credit report to her mother. (Ex. "A," Depo. of Blumenfeld pp. 110:1-12).

16. Even when she woke the next morning, Blumenfeld was still upset and angry that her private information had been discussed with her mother. (Ex. "A," Depo. of Blumenfeld pp. 113:1-8). She also kept thinking about how she did not

need the stress of this, especially given the tough time she was experiencing going through a divorce. She also starting feeling stress and embarrassment from what had happened. (Ex. "A," Depo. of Blumenfeld pp. 113:8-16).

17.    Ms. Fryer then gave Blumenfeld the credit report Mr. Goodwin had printed and started pointing out the things Goodwin had discussed with her – flipping through the report, pointing out the deficiencies and things Terry needed to work on, showing Terry the things Goodwin had circled, etc. (Ex. "A," Depo. of Blumenfeld pp. 119:19-120:9).

18.    Blumenfeld was extremely upset, mad and embarrassed and so taken back, that she was speechless. (Ex. "A," Depo. of Blumenfeld p. 120:10-17).

19.    Goodwin did not receive any kind of disciplinary action resulting from this event other than having to "discuss it" with his supervisor. (Ex. "C," Depo. of Goodwin p. 34:2–20).  Goodwin's supervisor merely told him in a phone call that he had "to receive a consumer's consent at the time of any credit authorization or credit access" and that the better practice is to go directly to the consumer whose credit report you're pulling to be sure you have their consent. (Ex. "C," Depo. of Goodwin p. 18:10-14, 26:12–16).

20.    Goodwin does not recall receiving training prior to May 2016 to not provide a copy of a consumer's credit report to anyone other than the consumer nor he does

not recall receiving any additional company-wide or yearly training on that issue. (Ex. "C," Depo. of Goodwin p. 38:17–39:6).

21.    Defendant's procedures state precautionary measures must be taken to prevent unauthorized disclosure of confidential information. (Ex. "C," Depo. of Goodwin p. 43:12-19). Though he could not identify the supposed policy, Goodwin's believed that Regions policies and procedures allowed him to disclose and discuss Blumenfeld's personal credit information with her mother. (Ex. "C," Depo. of Goodwin p. 48:14-49:17). Goodwin did not comply with Regions' actual policies and procedures regarding confidentiality of a consumer's credit information when he discussed Blumenfeld's credit report with her mother and provided her mother a copy. (Ex. "D" Depo of Smith p. 49:21-50:1).

22.    According to Regions' Mortgage Procedure documents a Mortgage Loan Originator (MLO) such as Goodwin, "may order a credit report only with the consumer's consent." (Ex. "C," Depo. of  Goodwin p.57:2–7). The procedure further states, "Regions prohibits MLO's from ordering a credit report without a **business purpose _and_ the borrower's express consent.**" (Ex. "C," Depo. of Goodwin p. 58:21 – 59:3, 63:18 – 64:3)(emphasis added).

23.    Goodwin could not say whether Blumenfeld had been asked by her mother if she wanted to take out the loan on the phone call as he was busy multitasking and

did not listen to the conversation. (Ex. "C," Depo. of Goodwin p. 60:20 – 61:14, 62:18–23).

24.    While Regions procedures require "express consent," they do not define express consent and Goodwin testified that he was not trained as to the differences between express consent versus regular consent or implied consent. (Ex. "C," Depo. of Goodwin pp. 64:6 – 65:6, 72:8 – 15).

25.    Goodwin was also not trained as to whether consent could be relayed to him by a third party on behalf of the alleged consumer. (Ex. "C," Depo. of Goodwin p. 72:16 – 73:8).

26.    Goodwin closes approximately 130 loans per year. (Ex. "C," Depo. of Goodwin p. 75:1 – 5).

27.    Goodwin admitted that he knew prior to the phone call that it was against the law for him to pull someone's credit report without their permission or consent. He stated that this reason was the purpose of the phone call to Blumenfeld. (Ex. "C," Depo. of Goodwin pp. 90:2 – 14, 90:20 – 91:4).

28.    Goodwin admitted that if he'd started pulling Blumenfeld's credit report before the phone call, that is, before he had permission, then that would violate the law. (Ex. "C," Depo. of Goodwin p. 91:5 – 21).

29.    At the time Goodwin provided Blumenfeld's credit report to her mother and went through the report in detail with her, he did not think there was anything

wrong with it. (Ex. "C," Depo. of Goodwin p. 93: 3). Since this incident, Goodwin was not aware of any additional safeguards put in place by Regions to make sure loan officers do in fact have consent from the consumer before there they pull the credit report. (Ex. "C," Depo. of Goodwin p. 93:19-23).

30.    Defendant admits that credit report privacy is equally important as medical privacy. (Ex. "C," Depo of Goodwin p. 109:15-110:3).

## III.    LEGAL ARGUMENT

### A.    Background On FCRA Related To Credit Reports

The FCRA clearly limits when a company, such as Defendant, can pull a credit report on a consumer such as Blumenfeld.

The Defendant must have permission to pull the report.  The starting point is there is no permission to pull a report <u>unless</u> the Defendant meets an exception which gives it permission to pull Blumenfeld's credit report.  In this case, there was no exception and thus no permission for Defendant to pull Blumenfeld's credit report.

### B.    Overview Of Rules On Accessing Or Pulling A Credit Report

For a company such as Defendant to pull a credit report on a consumer, the consumer now or in the past initiated a loan request or other business dealing.  And the credit report pull must relate to the loan or business dealing.  15 U.S.C. §1681b(a)(3)(A) allows credit pulls if "in connection with a **credit transaction**

**involving the consumer** on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." [Emphasis added].

Importantly, the consumer is Blumenfeld.  Not her mother.  Blumenfeld never was involved in a credit transaction.  And no account of consumer (Blumenfeld) was involved.

The only other possibility involves 15 U.S.C. §1681b(a)(3)(F), which allows pulling a report for:  "otherwise has a legitimate business need for the information—(i) in connection with a business transaction that is **initiated by the consumer**. . . ." [Emphasis added].

This does not apply, because if the transaction in question is credit based, only §1681b(a)(3)(A) applies.  But even if 1681b(a)(3)(F) applied, there was no business transaction "<u>initiated</u> by the consumer [Blumenfeld]."

### C.    In This Case The Only Possible Permissible Purpose Is Extension Of Credit But Regions Fails To Satisfy This Test

But here, Blumenfeld in fact did <u>not</u> request a credit transaction.  And no one impersonating Blumenfeld requested it.  Her mother (Ms. Fryer) did not pretend to be Blumenfeld.  There is no identity thief at all.

In *Bickley v Dish Network, LLC*, 751 F.3d 724 (6th Cir. 2014), an identity thief impersonating plaintiff sought satellite service from Dish.  But because of a

problem with the social security number, the plaintiff's credit report was pulled. Plaintiff sued Dish saying it was an unauthorized pull[2].

But the court correctly pointed out that Dish had no reason to doubt it was the plaintiff requesting the service. So the claims failed. As an example of when identity theft does <u>not</u> allow a credit pull, *see Rand v. Citibank, N.A.*, 2015 US Dist. LEXIS 14695 at *7-8 (N.D.Ca. 2015)(holding that Citibank should have known this was not the actual plaintiff applying as he was a long time customer and the social security number was incorrect, thus denying a motion to dismiss).

Here, Blumenfeld's mother was asked about refinancing <u>her own loan</u> — the mother's loan — and then <u>Blumenfeld's credit report was pulled before</u> her mother could say "Yes" or "No" to Defendant about Blumenfeld's wishes[3].

Silence does not equal yes when dealing with a third party who never purports to act as the agent for Blumenfeld.

There is no question that Blumenfeld did not request to do business with Regions in the taking out of a loan.

Next, Defendant tries to argue that because a spouse can agree for a consumer to have the consumer considered (along with the spouse) a credit

---

[2] As this was not a credit transaction (1681b(a)(3)(A)), the report was pulled under the business purpose under 1681b(a)(3)(F). As a practical matter, there is no difference in the analysis of these two subsections.

[3] Blumenfeld's mother has no legal or factual right to speak on behalf of Blumenfeld so the mother saying, "Yes" would be meaningless. But it is worth noting she never told Defendant what Blumenfeld said in the phone call, as the credit report had already been <u>pulled and printed while</u> she was still talking with her daughter Blumenfeld.

transaction, this somehow protects Defendant from liability.  But no spouse was involved.  Blumenfeld is not married.

In *Kruckow v. Merchs. Bank*, 2017 US Dist. LEXIS 113349 at *13-14 (D. Minn. 2017), the court dealt with a situation of a married couple.  The husband forged the wife's name to loans so that she would be jointly liable along with her husband.  She sued the lender who pulled her reports.  The court held that on several of the credit pulls the bank had no reason to doubt the wife was to be jointly liable with her husband so there was no FCRA violation.

In the present case, Blumenfeld is obviously not married to the "applicant," her mother.  And her mother did not lie or forge Blumenfeld's signature.  Finally, unlike *Kruckow*, any potential loan would have relieved the mother of liability and imposed liability only against Blumenfeld.  This is fundamentally different than a joint liability spouse situation where forgery occurs.  Here, the Defendant knew Blumenfeld was not present and it had no right to suppose or guess that a non-spouse (mother) could authorize credit pulls.

The cases cited by Defendant about a mistake are not applicable.  *Shepherd-Salgado v. Tyndall Fed. Credit Union*, 2011 US Dist. LEXIS 129128 (S.D.Ala. 2011)(plaintiff filled out credit application but was upset it was sent by non-party auto dealer to lenders who pulled additional credit reports – the key being plaintiff **sought** out the credit transaction).  *Morris v. Northland Group, Inc.* 2016 US Dist.

LEXIS 82215 at *3-6 (W.D.MOS 2016)(debt collector's authority to pull credit report flows from good faith belief that plaintiff owed money to collector's client – that plaintiff had entered into a loan that was being collected[4]).

Blumenfeld's mother did not impersonate Blumenfeld and did not pretend to be Blumenfeld's spouse. And the mother (Ms. Fryer) did not seek to also be liable on the loan — instead with Defendant's promptings, the mother sought to get out of liability by putting the liability solely on Blumenfeld.

In *Short v. Allstate Credit Bureau*, 370 F.Supp. 2d 1173 (M.D. Ala. 2005), the husband requested a farm loan. The wife told the lender not to pull her reports. The lender did anyway and the husband and wife sued the credit reporting agency (not the lender). The court held that the credit bureau defendant could reasonably believe that a lender for a farm loan would need the husband and the wife's credit reports as spousal credit reports are treated more broadly than other credit reports. *Id.* at 1179-80.

This is different than the present case – there is no spouse of Blumenfeld. Her mother is her mother, not her spouse. And in *Short*, the lawsuit was against a credit reporting agency – not the lender. In the present case, Blumenfeld has not

---

[4] The same is true for *Alston v. Cen. Credit Servs., Inc.*, 2013 US Dist. LEXIS 120658 at *6-8 (D. Md. 2013)(if a collector reasonably believes the debt is owed, a credit report can be pulled) and *Beckstom v. Direct Merchant's Credit Card Bank*, 2005 US Dist. LEXIS 16071 at *10-12 (D. Minn. 2005)(same). *See also Hudson v. Babilonia*, 192 F.Supp. 3d 274, 298-99 (D. Conn. 2016)(holding student loan company who reasonably believes consumer owes the debt is not liable for credit pull but once on notice of any issue such as ID theft, subsequent pulls may violate the FCRA).

sued the credit reporting agencies but instead the Defendant Regions who actually pulled the report.

Finally, this idea of Blumenfeld and her mother being "joint borrowers" or somehow the mother being the agent of Blumenfeld is unsupported by the law or the facts.  It is hornbook law that only the actions of the principal can create apparent agency.  *Brown v. St. Vincents*, 899 So. 2d 227, 236-238 (Ala.  2004).

Clearly there was no actual agency.  And nothing Blumenfeld did creates any appearance of agency.  For Defendant to argue or suggest that because they were joint owners of a property somehow creates agency is flawed.  Otherwise, every joint owner could tell a bank to pull credit reports on the other owner – not even Defendant would go this far.  Put simply – Blumenfeld was the only one that could request a loan or request her credit reports be pulled – for Defendant to rely on anyone else was <u>not only foolish but also unreasonable</u>[5].  Hiding behind the flimsy "joint borrowers" fallacy is factually wrong, not supported by case law and does not protect Defendant from liability.

### D.    After The Report Was Pulled, The Use Of The Report Violates FCRA

As shown above, the pulling of the report was wrong and violates the FCRA.

---

[5]While Defendant argues it acted reasonably, it violated its own policies.  (See Additional Undisputed Facts 1-5).  Besides this, the question of reasonableness is one for a jury to decide, weighing all the facts.

But then what Defendant did with the report is wrong also.  It gave a credit report to a third party — Blumenfeld's mother.

Blumenfeld's mother had no right to see or possess Blumenfeld's credit report.  She had no permissible purpose to see the report.

The FCRA prohibits this under the very same statute as we have been examining:  the permissible use statute found at §1681b(a)(3)(A).

Defendant carefully avoids discussing this aspect of its violation of the FCRA and instead only wants to talk about this under a "lack of publicity" in an invasion of privacy.

But when a company has a report that reflects upon a consumer's credit worthiness and it provides it to a third party, it must have a permissible purpose in doing so.  No such purpose exists for giving it to the mother.

Defendant, as a user, had no permissible purpose.  Defendant, had no permissible purpose to give the report to Blumenfeld's mother as she was not considering making an extension of credit to Blumenfeld.

Thus, Defendant has violated the FCRA again.

### E.   Willfulness

Defendant did not "accidently" or "mistakenly" pull Blumenfeld's credit report.  It did not mean to pull someone else's report and instead ended up with Blumenfeld's report.

Defendant got exactly what it intentionally wanted – to pull Blumenfeld's reports.

And Defendant did not accidently give her report to Blumenfeld's mother. Instead, it intentionally gave a copy of it to the mother.  And intentionally went over the report in detail with Blumenfeld's mother.

There was nothing accidental or mistaken about what Defendant did – it violated the FCRA with full knowledge of what it was doing.

As a result it is subject to the "willful" provisions of the FCRA found in Section 1681n which allows for punitive and statutory damages.

## F.    Invasion Of Privacy Is Not Preempted And Is A Jury Issue

The claims in the present case are <u>not</u> preempted as explained by Defendant's case of *Kruckow* at footnote 8 of the opinion.  The bottom line is the preemption provisions only apply to <u>required</u> disclosures – **not illegal disclosures**[6] such as we find in the present case.

---

[6] "Defendants also argue that the invasion-of-privacy claim is preempted by § 1681h(e), but that preemption applies to only disclosures required to be made by FCRA. "It makes sense that acts required to be done by the FCRA are immunized from state tort liability. **But Plaintiff's intrusion claim is based on an allegedly *illegal* disclosure—a disclosure made under false pretenses. The facts underlying that claim are completely opposite from a disclosure *required* to be made, so section 1681h(e) is in no way implicated**." *McAnly v. Middleton & Reutlinger, P.S.C.*, 77 F. Supp. 2d 810, 814- 15 (W.D. Ky. 1999). Here, Section 1681h(e) does not apply because the allegations relate to Defendants obtaining consumer reports and not Defendants reporting information. Thus, Defendants' preemption argument fails."  *Kruckow*, 2017 US Dist. LEXIS 113349 at *19, n8 (emphasis added).

<u>Over 40 years ago</u> the Alabama Supreme Court clearly recognized an invasion of privacy tort when a doctor releases confidential information on a medical patient. The same analysis holds true of improper releases of financial information in the form of credit reports.

In *Horne v. Patton*, 287 So. 2d 824 (Ala. 1973), the doctor released confidential information to Plaintiff's employer and the trial court rejected the claims. The Alabama Supreme Court overruled the trial court and quoted from an Ohio District Court[7] as follows:

> "When a patient seeks out a doctor and retains him, he must admit him to the most private part of the material domain of man. Nothing material is more important or more intimate to man than the health of his mind and body. Since the layman is unfamiliar with the road to recovery, he cannot sift the circumstances of his life and habits to determine what is information pertinent to his health. As a consequence, he **must disclose all information in his consultations with his doctor - even that which is embarrassing, disgraceful or incriminating**. To promote full disclosure, the medical profession extends the promise of **secrecy** referred to above.
>
> The candor which this promise elicits is necessary to the effective pursuit of health; there can be no reticence, no reservation, no reluctance when patients discuss their problems with their doctors. But the disclosure is **certainly intended to be private**. If a doctor should reveal any of these confidences, he **surely effects an invasion of the privacy of his patient**. We are of the opinion that the preservation of the patient's privacy is no mere ethical duty upon the part of the doctor; there is a legal duty as well. The **unauthorized revelation of medical secrets, or any confidential communication**

---

[7] *Hammonds v. Aetna Casualty & Surety Co.*, 243 F.Supp. 793 (N.D.Ohio, 1965)

**given in the course of treatment, is tortuous conduct which may be the basis for an action in damages**."

287 So.2d at 830 (emphasis added).

*See also Crippen v. Charter Southland Hospital, Inc.,* 534 So. 2d 286, 288 (Ala. 1988)(holding improper release of medical records is actionable in Alabama).

As shown with *Horne*, when we are dealing with inherently private and confidential information, any unauthorized disclosure is an invasion of privacy, particularly given that there was negative and embarrassing information in the credit reports that Blumenfeld never wanted her mother to see or know about.

### G. Wantonness Goes To The Jury As There Was No Banker/Customer Relationship Between Defendant and Blumenfeld

Defendant's basic argument is that a bank owes no duty to its customers in a loan application.  That may (or may not) be true but it is irrelevant.  Here, Blumenfeld never agreed to become a customer of Defendant on any type of loan.

Blumenfeld was a stranger to the Defendant bank and as such when the Defendant pulled her credit report – and later shared it with Blumenfeld's mother – it committed a gross violation of the law.  There is always a duty not to needlessly expose others to harm and here the Defendant knew that by pulling and sharing credit reports illegally (violating the FCRA and invasion of privacy), it was reckless indifferent to the harm to Blumenfeld.

Defendant has great power to (illegally or legally) pull credit reports on any American it wants.  No consumer can stop Defendant from doing this.

But if the rules and regulations and common sense don't stop Defendant from illegally pulling – and then sharing with third parties – then claims such as this wantonness claim are useful in helping Defendant understand not to ever do this again.  And it will encourage other banks to make sure they do not reckless endanger the privacy of other consumers.

## IV.    CONCLUSION

The facts and law are relatively simple.  A large bank such as Defendant is not to pull a credit report unless the consumer has agreed to do business with it.

Blumenfeld never agreed to do business with Defendant – never agreed to a mortgage loan.

To the extent Defendant tries to argue that Blumenfeld's mother was an agent for Blumenfeld, this fails as the facts do not show this.  Moreover, Defendant pulled and printed Blumenfeld's credit report while Blumenfeld was being asked if she wanted to do business with Defendant.

To make matters worse, Defendant then illegally gave Blumenfeld's credit report to her mother.

Defendant's conduct violates the FCRA and state law and a jury should be allowed to weigh the evidence and render a verdict.

Respectfully submitted,

/s/ M. Stan Herring
**John G. Watts (ASB-5819-t82j)**
**M. Stan Herring (ASB-1074-n72m)**
Watts & Herring, LLC
301 19th Street North
Birmingham, Alabama 35203
(205) 879-2447; (888) 522-7167 *facsimile*
john@wattsherring.com
stan@wattsherring.com
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on **November 21, 2017**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

John David Collins
Stephen J. Bumgarner
Mark D. Foley, Jr.
MAYNARD, COOPER & GALE, P.C.
2400 Regions/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2602

/s/ M. Stan Herring
Of Counsel

# EXHIBIT "A"

## Deposition of Terry Blumenfeld - Evidentiary Submission of Defendant [Doc. 30-1]

# EXHIBIT "B"

Deposition of
Jo Ann Fryer -
Evidentiary Submission
of Defendant
[Doc. 30-2]

# EXHIBIT "C"

Deposition of Tracy Goodwin - Evidentiary Submission of Defendant [Doc. 30-3]

# EXHIBIT "D"

Deposition of Kristy Smith - Evidentiary Submission of Defendant [Doc. 30-4]